# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-2308V

|  |  |
|---|---|
| ALEXANDER J. MCISAAC, *as personal representative of the Estate of Joseph Edmund McIsaac*,<br><br>                    Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br><br>Filed: June 20, 2025 |

*Courtney Christine Jorgenson, Siri & Glimstad, LLP, Phoenix, AZ, for Petitioner.*

*Felicia Langel, U.S. Department of Justice, Washington, DC, for Respondent.*

### FACT RULING DISMISSING TABLE CLAIM[1]

On December 20, 2021, Joseph McIsaac filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner[3] alleged that following his receipt of an influenza ("flu") vaccine on January 10, 2019, he developed Guillain-Barré syndrome ("GBS"). Petition (ECF No. 1) at ¶¶ 1, 3-4, 8, 19. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Joseph McIsaac died on December 8, 2024, during the pendency of this case. Ex. 11 at 1. On May 14, 2025, I granted the motion to amend the caption to name Alexander J. McIsaac, the personal representative of the Estate of Joseph McIsaac, as Petitioner. ECF No. 42. All references to Petitioner in this ruling refer to the decedent, Joseph McIsaac.

For the foregoing reasons, I determine that Petitioner is not entitled to compensation for a GBS Vaccine Injury Table ("Table") claim, and thus this claim is dismissed. But Petitioner has plead an alternative causation-in-fact claim, and may be able to substantiate this claim based on the same facts – and to that end I will transfer the matter out of SPU for further factual development, including expert input.

## I.    Relevant Procedural History

On February 23, 2022, Petitioner completed his required filings. ECF No. 10. On May 6, 2022, the case was assigned to the SPU. ECF No. 12. Respondent represented thereafter that he intended to defend this case, and filed a Rule 4(c) Report on January 4, 2023. ECF No. 21. Respondent opposed the Table GBS claim on the ground that Petitioner's claim "does not meet the onset requirement because his neurologic symptoms preceded the flu vaccination and/or developed less than three days after the vaccination." *Id.* at 11. Respondent also opposed an off-Table, causation-in-fact claim because Petitioner had not offered a "reliable medical theory causally connecting the flu vaccine to his neurologic condition." *Id.* at 12. Additionally, Respondent suggested that there was an alternate cause for Petitioner's neurologic symptoms. *Id.* at 13.

On April 26, 2023, I ordered the parties to brief the issue of onset. EFC No. 22. Petitioner thereafter filed additional evidence plus a brief setting forth his position. ECF No. 26 (Pet'r Br.). On August 21, 2023, Respondent filed his brief on the onset question. ECF No. 27 (Resp't Br.). Petitioner filed a reply brief on August 31, 2023. ECF No. 28 (Pet'r Reply Br.). The matter is ripe for adjudication.

## II.    Relevant Evidence

I have reviewed all of the evidence filed to date. I will only summarize or discuss evidence that directly pertains to the determinations herein, as informed by the parties' respective citations to the record and their arguments.

### A.    Petitioner's Pre-Vaccination Medical Situation

During the period preceding the January 10, 2019 vaccination, Petitioner was already in extremely poor health. Petitioner was morbidly obese (weighing almost 500 pounds) and had a history of binge alcohol consumption. Ex. 5 at 175, 2159. He did not have stable housing and was residing in a long-term stay hotel. Ex. 5 at 2161. In September 2018, Petitioner went to the emergency room of Lowell General Hospital in Lowell, Massachusetts with worsening lower extremity edema and pain, shortness of breath, and high blood pressure. Ex. 8 at 3. He was admitted to the hospital from September 9, 2018 to September 14, 2018, and had an arterial flutter, arterial fibrillation, congestive heart failure, and cellulitis and bleeding leg wounds. *Id.* at 3-4. Petitioner also had difficulty walking. *Id.* at 3.

2

On December 18, 2018, Petitioner returned to Lowell General Hospital. Ex. 8 at 42-56. Petitioner had been drinking heavily, did not take his medication, and had pain, heart palpitations, and weakness to the point that he had been bedbound on his couch for the previous four days. *Id.* When Petitioner tried to get up from the couch, he fell and injured his right knee and shoulder, but was able to call 911. *Id.* The hospital found that, in addition to his known heart conditions, Petitioner was suffering from severe degenerative osteoarthritis in his right knee, sepsis from *Pasteurella* bacteremia likely caused by his cellulitis, and a possible rotator cuff tear in his right shoulder. *Id.* at 42-43, 46, 49-50. Petitioner was treated with three weeks of intravenous antibiotics for the sepsis. *Id.* at 46.

Petitioner was discharged to Tewksbury Hospital ("Tewksbury") in Tewksbury, Massachusetts, an acute rehabilitation facility, on January 3, 2019. *Id.* at 45; Ex. 5 at 30-31. Upon admission to Tewksbury, the plan of care was for Petitioner to complete his course of intravenous antibiotics, to regain mobility through losing weight and physical and occupational therapy ("PT" and "OT"), and to receive support for his alcohol abuse. *Id.* at 32-33. Petitioner was unable to walk, and suffered pain in his right knee when attempting to move it. *See* Ex. 5 at 175-179. Petitioner required the assistance of four staff members to move from side to side in bed and six staff members to transfer from his bed to a bariatric wheelchair using a lift. *Id.* at 175, 190.

At Tewksbury, Petitioner was being monitored around the clock, with nurses and other staff making detailed notes multiple times a day about all of his body systems, as well as his pain levels, mood, food intake, and hygiene/toileting needs. Because Respondent challenges onset, asserting that Petitioner's symptoms appeared too quickly to satisfy the Table requirement of not less than three days after vaccination, it is necessary to review in detail Petitioner's condition leading up to his vaccination and in the four days that followed.

### B.    Petitioner's Symptoms Before And Immediately After Vaccination

On January 7, 2019, a nurse practitioner ("NP") noted that there had been several confirmed cases of flu on the unit and started Petitioner on Tamiflu as a prophylaxis. *Id.* at 184-185.

In the morning of January 9, 2019, Petitioner expressed anxiety about the plan to get him out of bed that day due to his right knee pain and was given Tramadol. *Id.* at 189. PT and OT staff then assisted Petitioner in getting out of bed and he sat in his wheelchair for three hours. *Id.* at 190. At lunch, while in the wheelchair, Petitioner reported feeling "off," "tired," and questioned if he had the flu. *Id.* Petitioner also stated that he believed that he may have "worn himself out worrying about getting up and then all the work to get into the chair." *Id.* Later that day, Petitioner reported that he was feeling better and denied any pain or discomfort. *Id.* at 191-192.

On January 10, 2019 (the day that he received the flu vaccine), Petitioner received Tramadol at 9:47 a.m. for pain before he was lifted from bed. *Id.* at 193; *see also id.* at

97. A nursing note from 1:44 p.m. stated that Petitioner was out of bed in his wheelchair and reported that his pain was better and that he was "feeling a little sleepy after taking Ultram."[4] *Id.* at 192. At 3:09 p.m., a substance counselor attempted to meet with Petitioner, but he was asleep and could not be roused. *Id.* at 459, 194. At 3:45 p.m., Petitioner met with a psychologist, who also found him sleeping, but noted that he "readily awakened and conversed . . . ." *Id.* at 100. The psychologist described Petitioner as "alert and oriented with euthymic affect." *Id.* at 100-101.

Petitioner received the flu vaccine at 4:30 p.m. on January 10, 2019, in his right deltoid.[5] *Id.* at 194. At 8:00 p.m., Petitioner reported that his left arm was "achy," but declined pain medication. *Id.* The nurse attributed this left arm ache to Petitioner's use of a bed trapeze to pull himself up. *Id.* Petitioner did not have any other complaints for the rest of that shift. *Id.*

At 12:45 a.m. on January 11, 2019, Petitioner was woken up by the nurse. *Id.* at 195. Petitioner reported that his abdomen was "achy" but not really painful, and that it felt "hard/different." *Id.* Petitioner was not worried about this sensation, but wanted to let someone know in case he was constipated. *Id.* Petitioner also reported that he "received the flu shot and muscles are achy like from lifting weights." *Id.* Petitioner then went back to sleep. *Id.*

At 11:49 a.m., Petitioner was feeling tired and "had a good workout." *Id.* He stated that overall, he was feeling better, and that his pain had improved. *Id.* Petitioner was described as being alert and in good spirits. *Id.* During PT on January 11, 2019, Petitioner reported "feeling achy" due to the flu shot. *Id.* at 108. Later in the afternoon, Petitioner refused to get out of bed because his arms were aching. *Id.* at 197. Petitioner later denied any pain and slept well. *Id.*

At 11:11 a.m. on January 12, 2019, Petitioner was resting in bed and wanted to catch up on sleep. *Id.* at 198. He complained of "increased weakness and soreness to upper body." *Id.* When the nurse asked if using the bed trapeze frequently could be causing these symptoms, Petitioner responded, "[Y]ou know what, PT worked me really hard yesterday and it was all upper body! I feel much better knowing what it is now." *Id.* A daily note from 11:36 a.m. also recorded that Petitioner had "weakness and malaise with fatigue. [C]hronic leg lymphedema and sedentary life style." *Id.* In an addendum dated 10:47 p.m. on January 12, 2019, the nurse added that Petitioner continued to complain of "discomfort to right knee and right shoulder with movement" but was "feeling less weakness than during the day." *Id.*

The next day (January 13, 2019), Petitioner complained at 6:00 a.m. of "numbness/weakness in hands and numbness in feet and tightness in [abdomen] said it

---

[4] Ultram is the brand name for the pain medication Tramadol.

[5] The record contains a handwritten provider order with a notation for January 10, 2019 and dated 10:30 a.m. for the flu vaccine. Ex. 5 at 28. The provider order stated "IM x1 STAT" and noted that it was for prophylaxis. *Id.* However, this record does not demonstrate that Petitioner actually received the flu vaccine at 10:30 a.m., only that it was ordered to be given immediately (STAT).

has been going on for 2-3 days." *Id.* at 199. Petitioner stated that he had not mentioned this to the doctor because he thought it was "lactic acid build up from PT . . . ." *Id.* However, he drank prune juice without any apparent hand weakness. *Id.* At 10:09 a.m., another nurse noted that Petitioner complained of "increased weakness to left [upper extremity] and [bilateral lower extremity]." *Id.* at 200. The nurse educated Petitioner on the need to reposition himself in the bed more frequently to take pressure off of his back. *Id.* Petitioner also received Tramadol with "good effect." *Id.*

At 9:00 p.m. on January 13, 2019, Petitioner reported, for the first time, that he was losing control of his facial muscles and could not "pucker lips as well, flare nose, or move ears" like he could before. *Id.* at 201. The nurse also stated that the bilateral finger numbness that Petitioner had previously mentioned had "started to resolve" and that "strength to lower extremities have improved." *Id.* In the early morning of January 14, 2019, Petitioner repeated that he had a "new complaint" that his lips and face muscles were weak. *Id.*

At 9:03 a.m. on January 14, 2019, Petitioner was seen by NP Laurie Brown about his report of bilateral upper and lower extremity weakness and slurred speech. *Id.* at 202. Petitioner reported that he felt that he was "passing out" and had difficulty eating breakfast and using his left hand to eat. *Id.* Petitioner stated that the feeling of "general weakness" had started "yesterday." *Id.* Petitioner had a slight left mouth droop, mildly slurred speech, and could not hold his lips together. Petitioner also reported that food fell from his mouth when he tried to eat. *Id.* NP Brown was concerned that Petitioner was experiencing a neurological event. *Id.* The Tewksbury staff called 911 and Petitioner returned by ambulance to Lowell General Hospital. *Id.*

At the emergency room, Petitioner reported generalized weakness, pain in his right shoulder and knee from severe arthritis and that "recently the left hand and leg is also getting weak and he is not able to raise his left leg." Ex. 8 at 61. Petitioner also reported weakness in his tongue and "numbness on both the lower extremities." *Id.* Petitioner said that "his symptoms have been going on for the past 3 days" and that nothing seemed to make it worse or better. *Id.* However, Petitioner also stated that his symptoms had "started a few days after flu shot." *Id.* at 62.

The medical staff at Lowell General Hospital diagnosed Petitioner with "most likely acute inflammatory demyelinating polyneuropathy (Guillain [B]arre syndrome)" that was "[l]ikely induce[d] by flu shot." *Id.* at 62, 64. Petitioner received intravenous immune globin ("IVIG") over eight days.[6] *Id.* at 67. On January 18, 2019, a doctor performed an electromyogram ("EMG"). *Id.* at 93. Although the EMG was "technically very difficult" due to Petitioner's obesity, the EMG found that "[s]ensory nerve responses from the left upper and bilateral lower extremities were absent." *Id.* The findings were "suggestive of a severe, chronic, predominantly axonal sensory motor polyneuropathy." *Id.* at 94. In his affidavit, Petitioner stated that at this time, he could not move his arms or legs at all, but only his head and neck, and feared that he might die. Ex. 1 at 2.

---

[6] Petitioner also developed right lower lobe aspiration pneumonia while at Lowell General Hospital. Ex. 5 at 214; Ex. 8 at 63-64.

### C.    Petitioner's Treatment From January to July 2019

On January 23, 2019, Petitioner returned to Tewksbury. Ex. 5 at 214-15, 1947. When he was readmitted, the examining physician, Dr. Prashant Wadhwa, summarized Petitioner's medical history and noted that Petitioner had been "diagnosed with acute inflammatory demyelinating polyneuropathy/Guillain-Barre syndrome likely induced by flu shot which patient received 4 days prior to his presenting symptoms of generalized weakness." *Id.* at 214. Petitioner was also described as having an allergy to the flu vaccine based on GBS. *Id.* at 215.

Petitioner resumed his PT, OT, and other treatments. *See, e.g.*, *id.* at 1951, 1957. Petitioner continued to deal with knee pain, weakness, and extreme difficulty moving and getting out of bed. *See id.* at 1955-56.

Petitioner was seen by orthopedist Dr. Lawrence Johnson on January 29, 2019. *Id.* at 1964, 2237-38. Dr. Johnson recorded that Petitioner had a flaccid right shoulder, mildly reduced right hand strength, and lower extremity paresis. *Id.* at 2238. Dr. Johnson associated the flaccid right shoulder and lower extremity paresis with GBS. *Id.* Furthermore, as previously documented, an x-ray of Petitioner's right knee showed advanced osteoarthritis. *Id.* Dr. Johnson gave Petitioner a cortisone injection in both knees. *Id.* Similarly, on February 27, 2019, a physiatrist, Dr. Maturin Finch, examined Petitioner and found that he had knee joint pain and "resolving Guillain-Barre residual neuropathic lower extremity pain." *Id.* at 2154.

On March 11, 2019, a neurologist, Dr. Samuel Frank, consulted on Petitioner's case as a follow-up for GBS. *Id.* at 2150. In describing the history of Petitioner's illness, Dr. Frank stated that Petitioner developed weakness four days after receiving the flu shot. *Id.* Dr. Frank first noted that Petitioner had axonal neuropathy, "which is not consistent with Guillain-Barre, but may be more consistent with his heavy alcohol history or toxic exposure from past." *Id.* at 2151. However, Dr. Frank believed that some of Petitioner's history "[was] consistent with Guillain-Barre, including the sudden change following the flu shot and the fact that he responded to 8 days of IVIG therapy is also consistent." *Id.*

Dr. Frank indicated that there was no need for further interventions for GBS because Petitioner was following a "very typical course with continued improvement, but residual weakness in the right shoulder region distally in his lower extremity and slight in the lower face." *Id.* Dr. Frank also stated that there was "no need to search for another diagnosis," but added that Petitioner's EMG was "unusual for Guillain-Barre, given that GBS is a demyelinating rather than axonal process." *Id.* Dr. Frank suggested certain "serological tests should be considered as complicating pictures given the axonal nature of his neuropathy," including testing for Lyme disease.[7] *Id.*

---

[7] Dr. Frank also stated that it was acceptable for Petitioner to receive the flu vaccine again because the American Academy of Neurology guidelines only indicated that patients with GBS should not get a flu vaccine again within three months. Ex. 5 at 2151.

Petitioner tested positive for Lyme disease on March 13, 2019. *Id.* at 2138-39. On March 25, 2019, Dr. Frank provided another consultation to follow-up on that testing. *Id.* at 2152. Dr. Frank stated that Petitioner had "an acute neuropathy that was called Guillain-Barre, but was axonal in nature, so was atypical." *Id.* Dr. Frank noted that Petitioner did not have a clear exposure to Lyme disease or a history of a rash, but had recently acquired a cat. *Id.* Dr. Frank recommended that Petitioner be treated with doxycycline for his Lyme disease. *Id.*

On March 28, 2019, Dr. David Sidebottom, an infectious disease specialist, examined Petitioner. Dr. Sidebottom believed that Petitioner's axonal polyneuropathy "certainly could be secondary stage Lyme disease." *Id.* at 2148. Dr. Sidebottom recommended that Petitioner receive oral doxycycline for one month, with a potential second month if his symptoms did not resolve. *Id.*

Petitioner's next relevant appointment was a follow-up with the orthopedist, Dr. Johnson, on April 1, 2019. *Id.* at 2243. Dr. Johnson found that Petitioner had dramatically improved because his right shoulder was no longer flaccid and he was no longer paralyzed below the waist. *Id.* Dr. Johnson stated that Petitioner had Lyme disease that "precipitated" his GBS and that he was recovering from "[GBS] type symptoms in the presence of likely Lyme disease." *Id.* at 2242-43. Dr. Johnson gave Petitioner another cortisone injection in the right knee and urged him to continue to lose weight so that he would be a candidate for knee replacement. *Id.* at 2243.

On April 12, 2019, Petitioner presented to a different neurologist, Dr. Jonathan Moray. *Id.* at 2249. Dr. Moray diagnosed Petitioner with an "acute inflammatory demyelinating polyradiculoneuropathic form of GBS." *Id.* Dr. Moray stated that he agreed that the "clinical picture is somewhat unusual for typical inflammatory demyelinating polyneuropathy" and that it was certainly possible for Petitioner's condition have been precipitated by the flu vaccine, although Dr. Moray believed that this had not occurred since 1976. *Id.* Dr. Moray noted that the role of Lyme disease "may be of some significance." *Id.* Dr. Moray indicated that Petitioner could need another course of IVIG if his symptoms worsened.[8] *Id.* Dr. Moray saw Petitioner again on June 20, 2019 and was encouraged by his improvement. *Id.* at 2248.

Petitioner continued to receive treatment at Tewksbury, but on July 4, 2019, he developed chills, fever, and shortness of breath. *Id.* at 2128. Petitioner was sent back to Lowell General Hospital and was diagnosed with pneumonia, sepsis, and rapid arterial fibrillation. *Id.* at 2128, 2256-57. Petitioner was discharged from Lowell General Hospital to Tewksbury on July 8, 2019, where he stayed until March 19, 2020. *Id.* at 2256.

---

[8] Petitioner received a follow-up EMG on March 29, 2019. *Id.* at 2240; Ex. 10 at 2155, 2158-61. Dr. Moray noted at the April 12, 2019 appointment that the repeat EMG had "demonstrated a severe length dependent axonal motor sensitivity neuropathy." *Id.* at 2151.

### D.    Petitioner's Subsequent Treatment

The July 8, 2019 to March 19, 2020 segment of Petitioner's medical records is largely irrelevant to determining entitlement for his GBS claim. Petitioner improved his mobility to the point that he could use a wheelchair independently and lost a significant amount of weight, dropping to 348 pounds. *See id.* at 2253-2255. Petitioner underwent a cardiac ablation to treat his arterial flutter on August 19, 2019. *Id.* at 4329. On March 19, 2020, Petitioner was discharged from Tewksbury to Marlborough Hills nursing home. *Id.* at 4437.

The only relevant records from this timeframe is from July 10, 2019, at a quarterly care conference at Tewksbury, when the staff discussed that "that [GBS] was ruled out by neuro and patient found to [sic] advanced Lyme causing same symptoms from original hospitalization." *Id.* at 4294. However, none of the neurologists that had examined Petitioner were actually present at this care conference. *See id.* at 4295. The representative of Petitioner's medical team was NP Brown. *Id.*

Similarly, on July 24, 2019, NP Brown produced a discharge summary for Petitioner's January 23, 2019 to July 4, 2019 stay at Tewksbury. *Id.* at 211-13. In discussing Petitioner's medical history and the March 11, 2019 and March 25, 2019 neurology consults, NP Brown appeared to believe that Dr. Frank had ruled out GBS and had instead endorsed Lyme disease as the cause of Petitioner's neurological condition. *Id.* at 212-13. NP Brown also removed a flu vaccine allergy from Petitioner's records based on Dr. Frank's comment that even individuals who have had GBS can receive a flu vaccine after three months. *Id.* at 213. However, a vast number of Petitioner's records continued to list GBS as one of his previous or ongoing medical issues.

Petitioner stayed at Marlborough Hills nursing home until December 22, 2020. Ex. 7 at 438-39. On December 22, 2020, after obtaining an apartment, Petitioner checked himself out against medical advice. *Id.*

### E.    Petitioner's Treatment After Leaving Marlborough Hills Nursing Home

On December 25, 2020, Petitioner returned to the Lowell General Hospital emergency department. Ex. 8 at 117. Petitioner reported that he did not have a wheelchair at his new accommodation and had not been eating or drinking much except for alcohol over the past couple of days. *Id.* Petitioner was treated for dehydration, tachycardia, and hypoxia. *Id.* at 119. Petitioner was discharged on December 29, 2020 with home health care support.[9] *Id.* at 117, 121.

Petitioner established care with Dr. John Dickason as his primary care provider. Ex. 5 at 55. At a June 22, 2021 appointment, Petitioner expressed some frustration that

---

[9] Petitioner's contention in his brief that he was hospitalized for over two years "due to his vaccine adverse event" is not supported by the record. *See* ECF No. 26 (Pet'r Br.) at 13. The medical records indisputably demonstrate that Petitioner had several serious health conditions that contributed to his need for such lengthy inpatient treatment.

he had "received a diagnosis of Lyme disease with some of the doctors thought [that] could have accounted for his neurologic condition consisting of paralysis of multiple limbs." *Id.* Petitioner felt that he "could be entitled to some compensation based on whether his symptoms originated from influenza vaccine." *Id.* In response to this concern, Dr. Dickason "reiterated that I feel that his prior neurologic syndrome which did seem consistent with Guillain-Barre, was more likely to have been due to influenza vaccine and than [sic] Lyme." *Id.*

As stated above, Petitioner passed away on December 8, 2024.

## III.    Ruling on Entitlement

### A.    Legal Standards

Under Section 13(a)(1)(A) of the Vaccine Act, a petitioner must demonstrate, by a preponderance of the evidence, that all requirements for a petition set forth in section 11(c)(1) have been satisfied. A petitioner may prevail on his claim if he has "sustained, or endured the significant aggravation of any illness, disability, injury, or condition" set forth in the Table. Section 11(c)(1)(C)(i). The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the covered vaccines, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). If a petitioner establishes a Table injury, causation is presumed.

If, however, the petitioner suffered an injury that either is not listed in the Table or did not occur within the prescribed time frame, the petitioner must prove that the administered vaccine caused his injury. Section 11(c)(1)(C)(ii) and (iii). In such circumstances, the petitioner asserts an off-Table claim and to prevail must prove his claim by preponderant evidence. Section 13(a)(1)(A). This standard is "one of . . . simple preponderance, or 'more probable than not' causation." *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1279-80 (Fed. Cir. 2005).

*Althen* requires that a petitioner

> to show by preponderant evidence that the vaccination brought about her injury by providing: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury.

*Id.* All three prongs of *Althen* must be satisfied. *Id.* The Federal Circuit has held that to establish an off-Table injury, a petitioner must "prove . . . that the vaccine was not only a but-for cause of the injury but also a substantial factor in bringing about the injury." *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1351 (Fed. Cir 1999). The received vaccine, however, need not be the predominant cause of the injury. *Id.* at 1351.

"The special master or court may not make such a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs.*, 993, F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

### B.    Factual Finding Regarding Onset For Table GBS Claim

A Table claim for GBS requires onset within "3 - 42 days (not less than 3 days and not more than 42 days)" after receipt of a seasonal influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(D). Also relevant to onset, the Table explains that GBS is generally marked by "bilateral flaccid limb weakness and decreased or absent deep tendon reflexes in weak limbs." 42 C.F.R. § 100.3(c)(15)(ii)(A).

In opposing compensation, Respondent argues that Petitioner has not met the Table onset requirement because his symptoms began too early - either before the January 10, 2019 vaccination or immediately in the one to two days afterwards. *See* ECF No. 21 at 11. Respondent's Brief emphasizes Petitioner's complaints of fatigue, numbness, weakness, and muscle aches on January 10, 2019, January 11, 2019, and January 12, 2019. ECF No. 27 (Resp't Br.) at 4-5; ECF No. 21 at 11. Respondent also highlights that on January 13, 2019, Petitioner complained of numbness and weakness "for 2-3" days, and that when Petitioner was admitted to Lowell General Hospital, he described his symptoms as having been ongoing for the past three days. *See* Resp't Br. at 4-5 (citing Ex. 5 at 199, Ex. 8 at 61).

After reviewing the entire record, I conclude that the onset of Petitioner's GBS more likely than not occurred less than 72 hours post-vaccination. In making this determination, I find the Tewksbury patient notes in Exhibit 5 to be especially probative because they provide a fulsome, detailed, and contemporaneous account of Petitioner's condition. These notes demonstrate that Petitioner was very willing to share concerns about his condition with his medical team. It is thus reasonable to assume that Petitioner

10

accurately reported his various complaints because he was in the midst of crucial, ongoing treatment.

In describing Petitioner's health pre- and post-vaccination, Respondent takes some of Petitioner's complaints out of context. For example, Petitioner's report of tiredness and feeling "off" on January 9, 2019 could be attributed to the effort of getting into his wheelchair. Similarly, Petitioner's sleepiness on January 10, 2019, could be due to taking pain medication, and his repeated complaints of muscle soreness and aches can be fairly connected to his increasing physical activity. Petitioner was already suffering from conditions that caused him pain and immobility and thus not all of his symptoms can be easily ascribed to GBS.

But Petitioner otherwise fails to engage with the specific chronology and number of hours between when he received the flu vaccine and when he developed the distinct symptoms of weakness and numbness. Indeed, Petitioner's Brief and Reply endorse the onset of weakness as occurring on January 13, 2019, but ignore that three full days had *not actually passed* since the January 10th afternoon vaccination. *See* Pet'r Br. at 14 ("The records reflect weakness on the morning of January 13, 2019, and further manifestation into January 14, 2019"); Pet'r Reply at 2 ("This record is important because it places the onset of weakness on January 13, 2019, which is three days post-vaccination."). In the morning of January 13, 2019, Petitioner clearly informed his nurses that he was already experiencing "numbness/weakness in hands and numbness in feet" and "increased weakness to left [upper extremity] and [bilateral lower extremity] . . ."[10] *Id.* at 200. Although this onset of symptoms occurred on the third *calendar day* post-vaccination, the actual time interval was less than 72 hours from the vaccination. And for purposes of an immune process resulting in clinically-evident symptoms, precision in the calculation of time is critical.

Further, Petitioner's own affidavit distinguishes between his achiness and soreness due to exercise and a new sensation of "tingling" in his hands and feet that started "approximately three days" after he received the vaccine." Ex. 1 at 1. According to Petitioner, this tingling froze his hands, caused him to lose mobility in his legs, and then, on January 14, 2019, progressed to his face. *Id.* This description matches Petitioner's contemporaneous complaints of weakness and numbness in his extremities in the morning of January 13, 2019 that then advanced to his facial muscles by the evening of that day and into January 14, 2019.

None of the other records identified by the parties in their briefing alter this analysis. The parties dispute the meaning of the nurse's note that at 6:00 a.m. on January 13, 2019, Petitioner complained of numbness/weakness in his hands and feet and tightness in his abdomen that had been "going on for 2-3 days." Ex. 5 at 201. Respondent argues that this demonstrates that Petitioner's symptoms occurred immediately after or even before vaccination, Resp't Br. at 4, but Petitioner asserts that the "2-3 days" only referred to the abdomen tightness. Pet'r Br. at 2. However, even if Petitioner is correct, this would

---

[10] It appears that Petitioner's weakness may have started as early as January 12, 2019. Ex. 5 at 197. However, this specific complaint could be explained by his use of the bed trapeze or intensive PT. *Id.*

still place the onset of weakness/numbness at no later than 6:00 a.m. on January 13, 2019, less than 72 hours after the vaccination.

Petitioner and Respondent also both rely upon the admission history generated when Petitioner was sent to Lowell General Hospital on January 14, 2019. *See* Pet'r Reply at 3; Resp't Br. at 4. This record is internally inconsistent, in that it stated both that Petitioner's symptoms had been "going on for the past 3 days" and that Petitioner's symptoms started "a few days" after the flu vaccine. Ex. 8 at 61-62. It therefore does not assist either party.

Finally, Petitioner points to the January 23, 2019 record created by Dr. Wadhwa upon his readmission to Tewksbury, which noted that he had been diagnosed with GBS "likely induced by flu shot which patient received 4 days prior to his presenting symptoms of generalized weakness." Pet'r Br. at 3 (citing Ex. 5 at 214). Respondent argues that this record was not made contemporaneously and should be given little weight. Resp't Br. at 5. Petitioner replies that 13 days post-vaccination still counts as contemporaneous with the underlying events. Pet'r Reply at 7.

I agree that in many instances, a record created only 13 days after a medical event has temporal/contemporaneous trustworthiness as a general matter. But I give this document less weight nevertheless, because it is simply inconsistent with what Petitioner reported ten days earlier, on January 13, 2019. Dr. Wadhwa's description of Petitioner receiving the flu vaccine "4 days prior to his presenting symptoms of generalized weakness" cannot erase the patient notes demonstrating that Petitioner in fact complained of weakness on the morning of January 13th.[11]

Accordingly, the totality of the record evidence preponderantly supports a finding of onset of Petitioner's GBS occurring less than 72 hours after vaccination. Petitioner therefore does not meet the Table requirements for a GBS claim.

## IV.   Resolution of a Causation-in-Fact Claim Will Require More Evidence

Petitioner has also plead an alternative non-Table, causation-in-fact claim. Because it raises reasonable questions of fact and/or medical science, Petitioner should be afforded the opportunity to prove such a claim.

The first *Althen* prong is not reasonably in dispute because there is preponderant evidence supporting a causal association between the flu vaccine and GBS, as

---

[11] Petitioner also references notations made by Petitioner's treaters on February 14, 2019 and March 11, 2019, which similarly stated that he developed symptoms of GBS four days after receiving the flu vaccine. Pet'r Br. at 11. I find that these records do not tilt the evidentiary weighing in Petitioner's favor. The February 14, 2019 record, for example, appears only to copy Dr. Wadhwa's admission history. *See* Ex. 5 at 1985. The March 11, 2019 record is Dr. Frank's neurology consultation. *Id.* at 2150. Although Dr. Frank made many relevant comments about Petitioner's diagnosis, he seems to have had incorrect information about the timing of Petitioner's vaccination, as he stated that Petitioner received the vaccine on January 12, 2019. *See id.* His after-the-fact description of the exact onset of Petitioner's symptoms has less evidentiary value than earlier, even *more* contemporaneous records.

recognized by numerous prior decisions. But both parties may wish to obtain expert reports or other evidence addressing whether Petitioner has established onset within a medically acceptable timeframe. Previous flu-GBS non-Table claims adjudicated in the Vaccine Program have mostly not succeeded where onset occurred earlier than three days after vaccination. *See Block v. Sec'y of Health & Human Servs.*, 19-969V, 2021 WL 5709764, at *4-*6 (Fed. Cl. Spec. Mstr. Oct. 29, 2021); *Rowan v. Sec'y of Health & Human Servs.*, No. 17-760V, 2020 WL 2954954 (Fed. Cl. Spec. Mstr. Apr. 28, 2020); *Orton v. Sec'y of Health & Human Servs.*, No. 13-631V, 2015 WL 1275459, at *3-4 (Fed. Cl. Spec. Mstr. Feb. 23, 2015). However, it certainly is not the case that a claimant could never establish a non-Table flu-GBS claim based on a short onset, especially given Petitioner's significant comorbidities. Regardless of the eventual outcome, this evidentiary development will need to take place outside of the SPU.

Additionally, in his Rule 4(c) Report, Respondent questioned the validity of Petitioner's GBS diagnosis, noting that Lyme disease was a potential alternate cause of Petitioner's symptoms. ECF No. 21 at 13. A close review of the record indicates that although the Tewksbury staff, particularly NP Brown, believed that GBS had been "ruled out" by Petitioner's neurologist, neither Dr. Frank nor Dr. Moray reached such a categorical conclusion. Dr. Frank ordered further testing for diseases that would be "complicating pictures," but specifically stated that there was "no need to search for another diagnosis[.]" Ex. 5 at 2151. Further expert development may also be necessary on this point if Respondent continues to challenge the nature of Petitioner's condition.

## Conclusion

**Petitioner's Table claim is dismissed. The case is transferred out of the SPU to a random Special Master for further proceedings relating to Petitioner's off-Table claim. A separate reassignment order shall also issue.**

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

13